UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

Estate of MOHAMMAD REZA
ABDOLLAHI, deceased, by and
through SINA ABDOLLAHI (a
minor through his mother and
guardian ad litem Parvin
Ganji), as successor in
interest; SINA ABDOLLAHI,
Individually; Estate of JOSE
ELIAZAR ARAMBULA, deceased,
by and through ELIAS ARAMBULA
and ANDREW ARAMBULA (minors
through their mother and
guardian ad litem Irma
Rodriguez), as successors in
interest; ELIAS ARAMBULA and
ANDREW ARAMBULA, individually;
SOCORRO ARAMBULA, individually;
AUSENCIO ARAMBULA, individually;
Estate of JAKE SUMMERS,
deceased, by and through his
mother DENISE HOFF (conservatee,
by and through her guardian ad
litem Judy Carver), as successor
in interest; DENISE HOFF,
individually; JULIEN PROVENCHER,
SR., individually; JEAN
THURSTON, individually;

       Plaintiffs,

    v.

COUNTY OF SACRAMENTO;
Sacramento County Sheriff's

NO. CIV-S-02-2488 FCD JFM
(Consolidated Cases)

**AMENDED**
MEMORANDUM AND ORDER

1

Department Sheriff LOU BLANAS;
Sacramento County Sheriff's
Department Captain JIM COOPER;
Sacramento County Sheriff's
Department Deputy THOMAS MANTEI;
JUDITH JOHNSON, R.N.; CHERYL
PAIZIS, D.O.; HENRY ISHIBASHI;
GAYLE GIPSON, R.N.; NANCY HARNETT,

    Defendants.
_____/

----oo0oo----

  This matter is before the court on defendants', County of Sacramento ("county"), Sheriff Lou Blanas ("Blanas"), Captain Jim Cooper ("Cooper"), Deputy Thomas Mantei ("Mantei"), Judith Johnson, R.N. ("Johnson"), Cheryl Paizis, D.O. ("Paizis"), Henry Ishibashi ("Ishibashi"), Gail Gipson, R.N. ("Gipson"), and Nancy Harnett ("Harnett"), motion for summary judgment or, in the alternative, motion for summary adjudication pursuant to Federal Rule of Civil Procedure 56.

## BACKGROUND[1]

  This is a consolidated civil right action brought under 42 U.S.C. § 1983 with supplemental state claims brought by the Estates of three decedents, Mohammad Reza Abdollahi ("Abdollahi"), Jake Summers ("Summers"), and Jose Arambula ("Arambula"),[2] and individual plaintiffs who are the parents or

---

[1] Unless otherwise noted, the facts recited herein are undisputed. <u>See</u> Pls.' Opp'n to Defs.' Stmt. of Undisputed Material Facts, filed Sept. 27, 2005; Defs.' Replies to Pl.'s Opp'n to Defs.' Stmt. of Undisputed Material Facts, filed Nov. 4, 2005. Where the facts are in dispute, the court recounts plaintiff's version of the facts.

[2] This action also consolidated the claims arising out of the death of a fourth inmate, Julien Provencher. The Provencher plaintiffs have dismissed their claims, and plaintiffs and defendants have filed stipulations with the court pursuant to Rule 41.

children of the decedents. All three decedents were inmates at the Sacramento County Jail when they committed suicide. Plaintiffs bring claims arising out of the suicides of the three inmates against the County of Sacramento, Sacramento County Sheriff Lou Blanas ("Blanas"), Captain James Cooper ("Cooper"), Deputy Thomas Mantei ("Mantei"), Judith Johnson, R.N.,[3] ("Johnson"), Henry Ishibahsi ("Ishibashi"), and Nancy Harnett ("Harnett").[4]

**A. Decedent Abdollahi**

Abdollahi was a pre-trial detainee in the Sacramento County jail for offenses involving the possession and use of drugs. (Pls.' Opp'n to Defs.' Stmt. of Undisputed Material Facts ("UMF"), filed Sept. 27, 2005, No. 161). Abdollahi was a heroin addict. (Id. at No. 171). He was interviewed at a medical screening where he appeared under the influence of some type of narcotics, which the nurse recorded was heroin. (Id. at Nos. 162, 169). He disclosed his addiction to heroin to the nurse, stating that he used I.V. heroin daily in his legs and arms. (Id. at No. 171). Abdollahi subsequently passed out. (Pls.' Stmt. of Disputed Facts ("SDF"), filed Oct. 10, 2005, No. 21).

On March 26, 2002, three days after incarceration, Abdollahi pressed his cell emergency button and threatened to commit

---

[3] The Summers plaintiffs have dismissed their claims against Judith Johnson, R.N. Plaintiffs and defendants have filed a stipulation with the court pursuant to Rule 41.

[4] This action was also brought against Gail Gipson, R.N., and Cheryl Paizis, D.O. The claims against Gipson were brought only by the Provencher plaintiffs, and have been dismissed. All plaintiffs have dismissed their claims against Cheryl Paizis, and plaintiffs and defendants have filed stipulations with the court pursuant to Rule 41.

1   suicide unless he could see a doctor.  (UMF No. 202; SDF No. 22).
2   Abdollahi was not seen by a doctor, but by a Jail Psychiatric
3   Services ("JPS") clinician, defendant Ishibashi.  (SDF No. 22).
4   Ishibashi interviewed Abdollahi for approximately ten minutes.
5   (Id. at No. 23).  Defendants contend that Ishibashi determined
6   that Abdollahi was not suicidal, but that he was complaining
7   about medication for withdrawals.  (Def. Ishibashi's Reply to
8   Pls.' Opp'n to Defs.' Stmt. of Undisputed Facts ("Ishibashi
9   RSUF"), filed Nov. 4, 2005, No. 6).  Plaintiff's dispute this
10  contention.  (Id.)  Ishibashi contacted Deputy Duke ("Duke"), the
11  officer on shift, and told Duke that he would contact the medical
12  staff to check on Abdollahi's medication; Ishibashi later called
13  Duke to tell him that Abdollahi was getting medication.  (UMF
14  Nos. 212-13).  Ishibashi gave Duke his pager number and asked
15  that he be called if Abdollahi was still feeling suicidal.  (Id.
16  at No. 214).

17      Later that night, Deputy Mantei arrived for his shift and
18  was briefed by Duke.  (Id. at No. 215).  When Mantei conducted
19  the cell checks during his shift, he noticed that the light in
20  Abdollahi's cell was covered with blue paper.  (Id. at Nos. 219-
21  20).  Mantei entered the cell to remove the paper and noticed
22  that Abdolahi had a torn piece of sheet, approximately 6 inches
23  wide, around his neck and shoulders.  (Id. at No. 221).  Mantei
24  asked Abdolahi what the sheet was doing around his neck, and
25  Abdollahi did not respond.  (Id.)  Mantei took all parts of the
26  sheet and left the cell, leaving Abdollahi with a blanket.  (Id.
27  at No. 222; Deposition of Thomas Mantei ("Mantei Dep."), Pls.'
28  Exh. 17, at 86).  Mantei did not notify JPS about his

                                4

observations when conducting the cell check. (Mantei Dep. at 81).

At 12:30 a.m., Duke conducted a cell check. (UMF No. 230). He immediately saw Abdollahi hanging from the bottom of the top bunk by a ligature. (Id.). Abdollahi had hung himself from a bunk hole, using strips of his blanket as a ligature. (Id. at No. 235).

**B. Decedent Summers**

Summers was a pre-trial detainee at the Sacramento County Jail for the offense of strong arm robbery. (Id. at No. 271). Summers was addicted to heroin. (SDF No. 27).

Summers was housed in a cell without a cellmate. (Id. at No. 29). After a traumatic day in court, Summers was brought back to his cell and left unchecked, alone in his cell, for the entire day. (Id. at Nos. 29-30). Deputy Kingsley, the only deputy working in Summers' housing unit that day, indicated in the log book that he had performed the cell checks when, in fact, he had not. (UMF Nos. 291-92; SDF No. 30). Kingsley was never disciplined for failing to properly perform cell checks in the unit or for falsifying the logbook. (Deposition of Ross Kingsley ("Kingsley Dep."), Pls.' Exh. 7, at 28-30).

An inmate worker found Summers' body at 5:45 p.m. (UMF No. 294). Prior to his death, Summers had written a suicide note on the wall of his cell. (SDF No. 31). The state of Summers' body when found indicates that he had been dead for some time before his body was discovered. (Id. at No. 33). Summers had hung himself from a bunk hole in the top bunk of the cell, using a torn-up sheet as a ligature. (UMF No. 301).

5

1

**C. Decedent Arambula**

2    Arambula was transferred to the Sacramento County Jail from

3 the prison CDC Solano on February 21, 2001.  (<u>Id.</u> at No. 371).

4 Upon his arrival, the jail was made aware that Arambula had a

5 history of psychiatric issues and suicide attempts.  (<u>Id.</u>).  The

6 social worker assigned to Arambula saw him on February 22, 2003,

7 and noted that Arambula had auditory command hallucinations

8 concerning killing himself.  (Declaration of Edward Kaufman

9 ("Kaufman Decl."), Exh. 15, ¶ 45).  He denied that he would

10 follow those commands.  (<u>Id.</u>)  The social worker informally

11 suggested that Arambula be housed in the out-patient housing

12 unit, but her suggestion was rejected.  (Deposition of Suzanne

13 Royston ("Royston Dep."), Exh. 119, at 24).

14    JPS psychiatrists conducted psychiatric evaluations of

15 Arambula during March and April of 2003.  (Kaufman Decl. ¶¶ 46-

16 47).  They noted his history of suicide attempts.  (<u>Id.</u> ¶ 46).

17 Arambula also had delusions, such as thinking he was God.  (<u>Id.</u> ¶

18 47).  JPS found that he was psychotic and continued his

19 antipsychotic medication at a low dosage.  (<u>Id.</u> ¶ 46).  Arambula

20 complained of daily command hallucinations, but JPS doctors found

21 that he was able to resist acting on those.  (<u>Id.</u> ¶ 47).

22    Subsequently, Arambula's relationship with JPS deteriorated.

23 (<u>Id.</u> ¶ 48).  He refused to meet with his social worker on several

24 occasions and requested that his medication stop.  (<u>Id.</u>)  When a

25 JPS psychiatrist attempted to meet with Arambula in June 2003,

26 Arambula refused, but assured her that he was okay to stop his

27 medication, and that his hallucinations had decreased and

28 minimized his past suicidal attempts.  (<u>Id.</u>)

6

1    On July 24, 2003, Arambula flooded his cell.  (UMF No. 373).
2   He was placed outside the control room, where he engaged in an
3   animated conversation with himself.  (<u>Id.</u> at No. 374).  He then
4   walked to the sliding glass doors and repeatedly banged his
5   forehead into the door in a purposeful manner.  (<u>Id.</u> at No. 375).
6   At least four deputies responded to Arambula's actions.  (<u>Id.</u> at
7   Nos. 376-82).  Arambula resisted and kicked at the officers.
8   (<u>Id.</u> at Nos. 377-85).  After the deputies subdued him, Arambula
9   began banging his head into the cement floor.  (<u>Id.</u> at No. 386).
10  Arambula was placed into a restraint chair.  (<u>Id.</u> at No. 387).

11   JPS was contacted by both the nurse who came to inspect
12  Arambula's restraints and by the deputies who expressed concern
13  over Arambula's behavior.  (Def. Harnett's Reply to Pls.' Opp'n
14  to Defs.' Stmt. of Undisputed Facts ("Harnett RSUF"), filed Nov.
15  4, 2005, No. 3; SDF No. 37).  At no point were the deputies
16  alerted to Arambula's documented history of suicide attempts,
17  psychiatric hospitalizations, his diagnosis as psychotic, or the
18  fact that he had stopped taking prescribed anti-psychotic
19  medications.  (SDF No. 36).

20   Nancy Harnett, an unlicensed social worker, interviewed
21  Arambula.  (UMF No. 390; Harnett RSUF No. 7; Defs.' Reply to
22  Pls.' Stmt. of Disputed Facts ("RSDF"), filed Nov. 4, 2005, No.
23  40).  The officers told her about Arambula's erratic behavior.
24  (Harnett RSUF No. 6).  Harnett spent approximately ten minutes
25  with Arambula.  (<u>Id.</u> at No. 7).  Harnett told custody that there
26  was no need for any precautions and indicated that he was
27  "whiney."  (UMF No. 391; SDF No. 38).

28

Arambula was placed back in his cell where he remained for approximately four hours until he was found hanging. (UMF No. 392). Arambula hung himself from a fire sprinkler in the middle of his cell, using a bed sheet as a ligature. (Id. at No. 408-09).

### D. Policies and Practices

The County implemented several policies that plaintiffs challenge as establishing municipal liability. First, the County had a policy of housing heroin addicts in the general population with a detoxification protocol, but without an individualized treatment plan from a physician. (Id. at Nos. 32-33). Second, the county defendant implemented a policy regarding its cell checks[5] and staffing. Plaintiffs contend that at the time of Summers' death, the Sacramento County Jail was systematically understaffed and frequently assigned a single officer to work a housing unit. (SDF No. 15). Plaintiffs also contend that, during this time, cell checks occurred less frequently than the proscribed hourly checks, (Id. at No. 16), and that jail officials condoned or ratified a policy of "pencil whipping," which consisted of officers marking that cell checks had been performed when they actually had not. (Deposition of Chester Stewart ("Stewart Dep."), Pls.' Exh. 8, at 27-28). Finally, plaintiffs contend that at the time of all three suicides, the Sacramento County Jail had suicide prevention policies that were grossly inadequate. (SDF No. 17). Plaintiffs assert that, at

---

[5]   "Cell checks" is a term of art that describes the regular inspection of inmates by correctional staff. (Pls.' Opp'n Summ. J., filed September 28, 2005, at 17).

the time of Abdollahi's and Summers' death, the program was a program in name only, and that there were deficient procedures for identification, evaluation, monitoring, placement, communication and training. (Declaration of Richard Hayward (Hayward Decl."), Pls.' Exh. 16). The suicide prevention program was revised in October 2002, prior to Arambula's death. (Suicide Prevention Program, Pls.' Exh. 20). Plaintiff's contend that this revised program was still constitutionally deficient because of the absence of a requirement that custodial staff increase monitoring levels on potentially suicidal inmates and its lack of a system to effectively communicate an individual's suicide risk to custodial staff. (Hayward Decl. ¶ 24).

Defendants filed motions for summary judgment, or in the alternative, summary adjudication, for all claims brought by the plaintiffs. While defendants filed some of their motions separately, the court addresses all defendants' motions together.

## STANDARD

The Federal Rules of Civil Procedure provide for summary adjudication when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). One of the principal purposes of the rule is to dispose of factually unsupported claims or defenses. Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986).

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the

non-moving party.  United States v. Diebold, Inc., 369 U.S. 654,

655, 82 S. Ct. 993, 8 L. Ed. 2d 176 (1962).  If the moving party

does not bear the burden of proof at trial, he or she may

discharge his burden of showing that no genuine issue of material

fact remains by demonstrating that "there is an absence of

evidence to support the non-moving party's case."  Celotex, 477

U.S. at 325.  Once the moving party meets the requirements of

Rule 56 by showing there is an absence of evidence to support the

non-moving party's case, the burden shifts to the party resisting

the motion, who "must set forth specific facts showing that there

is a genuine issue for trial."  Anderson v. Liberty Lobby, Inc.,

477 U.S. 242, 256, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

Genuine factual issues must exist that "can be resolved only by a

finder of fact, because they may reasonably be resolved in favor

of either party."  Id. at 250.  In judging evidence at the

summary judgment stage, the court does not make credibility

determinations or weigh conflicting evidence.  See T.W. Elec. v.

Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir.

1987) (citing Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio

Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538

(1986)).  The evidence presented by the parties must be

admissible.  Fed. R. Civ. P. 56(e).  Conclusory, speculative

testimony in affidavits and moving papers is insufficient to

raise genuine issues of fact and defeat summary judgment.  See

Falls Riverway Realty, Inc. v. City of Niagara Falls, 754 F.2d

49, 57 (2d Cir. 1985); Thornhill Publ'g Co., Inc. v. GTE Corp.,

594 F.2d 730, 738 (9th Cir. 1979).

10

**ANALYSIS**

The plaintiffs bring claims against various defendants under both federal law and state law.  As a general matter, plaintiffs have alleged claims under § 1983 against each defendant.  To state a claim under § 1983, plaintiffs must demonstrate that (1) defendants acted under color of law, and (2) defendants deprived plaintiff of rights secured by the Constitution or federal statutes.  <u>Gibson v. U.S.</u>, 781 F.2d 1334, 1338 (9th Cir. 1986). Defendants do not dispute that they were acting under color of law in regard to the conduct in question.  Therefore, the court's analysis will focus only on the issue of whether there is a triable issue of fact that defendants deprived the plaintiffs of constitutionally protected rights.

The impetus of all plaintiffs' claims is that various municipal actors caused the wrongful deaths of Abdollahi, Summers, and Arambula.  Plaintiffs allege that defendants' policies, actions, or omissions constituted constitutional violations because the defendants were deliberately indifferent to the needs of the three inmates who were exhibiting suicidal tendencies.

In <u>Farmer v. Brennan</u>, 511 U.S. 825, 833 (1994), the Supreme Court held that "prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates.[6]  (Internal quotations omitted).  In bringing a claim

_____

[6]      The petitioner in <u>Farmer</u> was a post-conviction prisoner, and therefore, the Supreme Court analyzed the § 1983 claims based upon prison officials acts or omissions under the 8th Amendment cruel and unusual punishment clause.  Pre-trial

against prison officials under § 1983 on the basis of prison conditions, a claimant must show (1) an objectively, sufficiently serious deprivation and (2) that the prison official had a "sufficiently culpable state of mind," which in prison condition cases is "one of deliberate indifference to inmate health or safety." <u>Id.</u> at 835.

The standard of deliberate indifference requires that the official must "both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." <u>Id.</u> at 837.

> Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.

<u>Id.</u>

Applying these standards to plaintiffs' § 1983 claims, the court addresses the claims against each defendant in turn.

**I.    Claims against the County of Sacramento**[7]

Plaintiffs allege several violations of Section 1983 against

_____

detainees' claims against prison officials are based upon the guarantees under the due process clause of the Fourteenth Amendment. However, the standard and interpretation of deliberate indifference is the same under both clauses for the purposes of prisoner suits. <u>See</u> <u>Gibson v. County of Washoe, Nevada</u>, 290 F.3d 1175, 1196 (9th Cir. 2002). Thus, the same analysis will apply to all of the plaintiffs' claims regardless of whether the inmate was a pre-trial or post-conviction detainee.

[7]    Plaintiffs concede that they have no viable state law claims against Sacramento County because of applicable immunities. Therefore, the court does not address these arguments, and summary judgement is GRANTED to defendant County as to the state law claims.

the County of Sacramento.  Specifically, Abdollahi and Summers

allege that the county violated their substantive due process

rights, Arambula alleges that the county violated the Eighth

Amendment prohibition against cruel and unusual punishment, and

all of the plaintiffs allege the loss of the parent/child

relationship in violation of their substantive due process

rights.

"A municipality may be held liable under a claim brought

under § 1983 only when the municipality inflicts an injury, and

it may not be held liable under a respondeat superior theory."

Gibson v. County of Washoe, Nev., 290 F.3d 1175, 1185 (9th Cir.

2002) (citing Monell v. New York City Dept. of Social Services,

436 U.S. 658, 694,(1978)). The Ninth Circuit has provided that

county liability can be established by direct liability and

liability by omission.  Id. at 1186.

**A. Direct Liability**

Plaintiffs argue that county defendant is directly liable

under Section 1983 for policies it employed.[8]  To establish

direct liability, plaintiff must show "that a municipality itself

violated someone's rights or that it directed its employee to do

so."  Gibson at 1185 (citing Board of County Comm'rs of Bryan

County v. Brown, 520 U.S. 397, 404,(1994)).  A plaintiff may hold

a municipality liable under section 1983 for its official acts

pursuant to city policy, regulation, custom, or usage.  Chew v.

---

[8]     At the Nov. 18, 2005 hearing, plaintiffs conceded that
the county's liability for the Sacramento County Jail's suicide
prevention policy is more appropriately analyzed under a
liability by omission theory, and not under a theory of direct
liability.  Therefore, the court will only address the policy as
potential liability by omission.

13

1  <u>Gates</u>, 27 F.3d 1432, 1444 (9th Cir. 1994) (citing <u>Monell</u>, 436

2  U.S. at 690-91, 694).

3      In order for the County to be liable under a direct

4  liability theory, the County must have (1) had a policy that

5  posed a substantial risk to plaintiffs and (2) known that its

6  policy posed this risk.  <u>Gibson</u>, 290 F.3d at 1188.  In addition,

7  a plaintiff must then demonstrate that the municipal policy or

8  failure to supervise "caused" the constitutional deprivation.

9  <u>Id.</u>  A municipal policy "causes" injury where it is the "moving

10  force" behind the violation.  <u>Chew</u>, 27 F.3d at 1444 (citing

11  <u>Monell</u>, 436 U.S. at 690-91, 694).

12      **1. <u>Heroin Detoxification Policies and Procedures</u>**

13      Plaintiffs argue that the county's heroin detoxification

14  policies and procedures posed a substantial risk to plaintiffs

15  and that the county was aware of the risk that this policy posed.

16  The County had a policy of housing heroin addicts in the general

17  population with a detoxification protocol, but without an

18  individualized treatment plan from a physician.  As such,

19  plaintiffs contend that county defendants heroin detoxification

20  policy was grossly inadequate because inmates did not receive an

21  individualized treatment plan from a medical doctor and were

22  housed in the general population.  (<u>See</u> SDF No. 18).

23      While both Abdollahi and Summers were addicted to heroin,

24  jail personnel received no indication or information that Summers

25  was experiencing withdrawals from heroin.  Plaintiffs have

26  produced no evidence that Summers was experiencing heroin

27  withdrawals while at the Sacramento County Jail.  While

28  plaintiffs contend that the screening process may have been

14

inadequate in identifying that Summers was an addict, they have
not presented evidence that this was the moving force or even a
direct cause of his death.  Further, plaintiffs have produced no
evidence that Arambula was a heroin addict or experiencing
withdrawal symptoms.  Therefore, the claim against the county
based upon the heroin detoxification policy is analyzed only as
it applied to Abdollahi.  Defendants' motion for summary judgment
in regards to county liability for the heroin detoxification
policy as it applies to the Summers plaintiffs and the Arambula
plaintiffs is GRANTED.

In regards to the Abdollahi plaintiffs, plaintiffs present
evidence to demonstrate that the county's heroin detoxification
policy constituted a substantial risk.  Plaintiffs present the
statements of a psychiatric expert, Edward Kaufman, M.D., that
provide that inmates who are withdrawing from drugs are more
likely to commit suicide because inadequate treatment results in
a great deal of pain and suffering from heroin withdrawal.  (SDF
No. 4; Kaufman Decl., Pl.'s Exh. 15, ¶ 26).  Kaufman further
states that heroin is the most physiologically addicting drug
because of crippling muscle pain, vomiting, severe diarrhea, and
the inability to sleep.  (Kaufman Decl. ¶ 34).  In addition,
Kaufman contends that the county's inadequate detoxification
policy was a direct cause of Abdollahi's death.  (Id. ¶ 42); see
Cabrales v. County of Los Angeles, 864 F.2d 1454, 1461 (9th Cir.
1988) (vacated on other grounds) (finding that prison or jail
officials show deliberate indifference when prisoners cannot
adequately receive treatment from medical staff).  Thus, a
reasonable juror could find that the county's policy of housing

15

heroin addicts within the general population poses a substantial risk to plaintiffs.

Plaintiffs provide evidence that the county knew of the substantial risk that its heroin detoxification posed.  An entity's awareness can be demonstrated by direct or circumstantial evidence.  <u>Gibson</u>, at 290 F.3d 1190.  The court in <u>Gibson</u> found that the County of Washoe, Nevada circumstantially knew that its policies presented significant risks to detainees with manic disorders and supported its finding with three reasons.  <u>Id.</u>  First, the <u>Gibson</u> court found that county policymakers knew that some prisoners arrive at the jail with urgent health problems.  Second, the court found that mental illness and manic phases specifically were within the range of health problems requiring urgent health care.  <u>Id.</u>  Third, the court found that the county not only knew of the need to treat the mentally ill, but in fact ignored these medical needs.  <u>Id.</u> at 1191.

In this case, defendant county knew that some inmates are heroin users or heroin addicts; the county's chemical dependence policy imputes such knowledge.  (UMF No. 33; Chemical Dependence Policy, Adm. Policy 1414, Pls.' Exh. 33, filed September 19, 2005).  The county also knew that heroin withdrawal is a health problem that requires medical attention; the county had an established detoxification policy to give some medical attention.  (<u>Id.</u>)  Finally, plaintiffs present evidence that the county decided not to implement sufficient procedures to respond to those risks.  The county required individuals intoxicated with alcohol to be placed in detoxification cells for closer

monitoring.  (UMF No. 30; Detoxification Mgmt CHS Policy 1404, Pls.' Exh. 34).  However, the County's heroin detoxification policy required employees to place detainees requiring Heroin detoxification in the prison's general population.  (UMF No. 32). Thus, a juror could reasonably conclude that the county directly knew or constructively knew of the substantial risk that its heroin detoxification policy presented to Abdollahi.

_____Plaintiffs also present evidence that the county's heroin detoxification policy caused the constitutional violation and was its moving force.  According to Kaufman, the Sacramento County Jail's inadequate detoxification procedures directly contributed to Abdollahi's death.  (Kaufman Decl., Pl.'s Exh. 15 at 42).

Because a reasonable juror could conclude that the county's policy regarding heroin detoxification posed a substantial risk to Abdollahi, that the county was aware of that risk, and that the policy was the moving force behind the constitutional violation, defendants' motion for summary judgment for county liability based upon the heroin detoxification policy as it applies to the Abdollahi plaintiffs is DENIED.

## 2.   Cell Checks and Staffing

_____Plaintiffs challenge the county's policy regarding cell checks and staffing in the Sacramento County Jail.  Plaintiffs argue that the county's practice of assigning a single officer to conduct cell checks without a corresponding policy of how to properly conduct cell checks with only one officer contributed to Summers' suicide.

While both Abdollahi and Arambula may have benefitted from more frequent cell checks, plaintiffs have produced no evidence

17

that the alleged understaffing or deficient cell check policy contributed to or were a direct cause of the deaths of either Abdollahi or Arambula.  Therefore, the claim against the county based upon its policies of cell checks and staffing is analyzed only as it applied to Summers.  Defendants' motion for summary judgment in regards to county liability for the cell check policy as it applies to the Abdollahi plaintiffs and the Arambula plaintiffs is GRANTED.

In regards to the Summers plaintiffs, plaintiffs present evidence to demonstrate that the county's policies constituted a substantial risk.  Title 15, Section 1027 of the California Code of Regulations mandates the performance of cell checks by a sufficient number of personnel.  Further, plaintiffs present evidence that cell checks are essential for the protection of inmates and that cell checks and cellmates are the factors that interrupt most suicide attempts.  (SDF No. 9).
Thus, a jury could reasonably conclude that the county's policy of understaffing which resulted in less frequent cell checks posed a substantial risk.

Plaintiffs present evidence to demonstrate that defendant county knew that its policies regarding staffing and cell checks posed a substantial risk.  County employees knew that inadequate cell checks would affect the safety of its inmates.  (See Deposition of Lou Blanas, Pls.' Exh 4, at 7; Deposition of James Cooper, Pls.' Exh. 39, at 28).  The county also had notice that there was a common practice of "pencil whipping", logging that cell checks had been done when they had not.  This practice was a frequent topic at watch briefings, yet no discipline was

18

administered to deputies who engaged in this conduct, including
Deputy Kingsley. (Stewart Dep. at 27-28; Kingsley Dep. at 28-
30).  Further, plaintiffs contend that defendants allowed visual
checks, such as those which occurred during pill counts, to
replace requisite cell checks, when such visual checks were
insufficient.  (UMF No. 330).

Plaintiffs argue that cell checks could not be performed
adequately because the jail was significantly understaffed.
(Main Jail Division Staffing Reports, Exhs. 109-111 filed
September 29, 2005.)  The county's decision to not fully staff
the jail demonstrates awareness because the county is, in
essence, ignoring the substantial risk that results from this
decision.  <u>See</u> <u>Gibson</u> 290 F.3d at 1191 (finding that a county's
decision to not fully staff its services constitutes knowledge).
Thus, a juror could reasonably find that the county was aware its
policies regarding cell checks and policies posed a substantial
risk.

Plaintiffs further contend that the defendant county's
policies regarding cell checks and staffing also constituted a
moving force.  Plaintiffs present evidence that one specific
factor that contributed to Summers' death was inadequate
observation of him in his cell.  (Kaufman Decl. ¶ 55).

Because a reasonable juror could conclude that the county's
policy regarding cell checks and staffing posed a substantial
risk to Summers, that the county was aware of that risk, and that
the policy was the moving force behind the constitutional
violation, defendants' motion for summary judgment for county

19

liability based upon the cell check policy as it applies to the Summers plaintiffs is DENIED.

**B.**   **Liability by Omission**

Alternatively, a municipality can also be liable by a failure to act, such as inadequate training policies.  For example, a policy of inadequate police training may serve as the basis for section 1983 liability only where "the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact," and where the identified training deficiencies are "closely related" to the plaintiff's ultimate injury.  See City of Canton v. Harris, 489 U.S. 378, 388-91 (1989) (*questioned* in Tokar v. Armontrout, 97 F.3d 1078, 1083 (8th Cir. 1996), providing that the deliberate indifference standard is not objective).  The question of whether a municipality may be held liable under a "failure-to-train" theory is generally a question for the jury.  See Oviatt v. Pearce, 954 F.2d 1470, 1478 (9th Cir. 1992).

For a claim of liability by omission to go to the jury, plaintiffs must demonstrate evidence that (1) a county employee violated plaintiffs' rights; (2) the county has customs or policies that amount to deliberate indifference; and (3) these policies were the moving force behind the employee's violation of plaintiffs' constitutional rights.  Gibson, 290 F.3d at 1194.  In this case, all plaintiffs' allege that the omissions in the county's policies, procedures, and practices pertaining to suicide prevention serves as a basis of Section 1983 liability against the county defendants.

20

1    ____The county's suicide prevention policy changed in 2002,

2    after the deaths of Summers and Abdollahi.   Therefore, a

3    different policy applied at the time of Arambula's death.

4    ____         **1.   The Suicide Prevention Policy in place at the time**
              **of the Abdollahi and Summers Deaths**

5

6    ____Plaintiffs claim that county defendants are liable for

7    omissions in training of county employees regarding suicide

8    prevention.

9         To satisfy the first prong of <u>Gibson</u>, plaintiffs allege that

10   various county employees violated plaintiff's constitutional

11   rights.   In Abdollahi's case, plaintiffs present evidence that

12   defendants Mantei and Ishibashi violated Abdollahi's

13   constitutional rights through deliberate indifference to his

14   safety.   For the reasons discussed below regarding plaintiffs'

15   claims against Mantei and Ishibashi, this prong has been

16   satisfied.   In Summers' case, plaintiffs present no evidence that

17   a county employee violated Summers' rights through deliberate

18   indifference.   Kingsley, the only officer who worked at the time

19   of Summer's death, made notations in his log book that he had

20   performed cell checks when in fact, he had not.   (UMF No. 291).

21   However, this conduct, without more, does not amount to

22   deliberate indifference to Summers' safety.   Plaintiffs do not

23   present direct or circumstantial evidence that Kingsley knew that

24   Summers was suicidal.   Without the supported contention that a

25   county employee committed a constitutional violation, plaintiffs'

26   claim for liability by omission cannot stand.   Thus, defendants'

27   motion for summary judgment for county liability based upon the

28

1  suicide prevention policy as it applies to the Summers plaintiffs
2  is GRANTED.

3      To satisfy the second prong of Gibson, the Abdollahi
4  plaintiffs must present evidence that the county has customs or
5  policies that amount to deliberate indifference.  Gibson, 290
6  F.3d at 1194.  Deliberate indifference occurs when the
7  policymakers' omission "is so obvious, and the inadequacy so
8  likely to result in the violation of constitutional rights."
9  Canton, 489 U.S. at 390.  "The need to act may be obvious because
10 any reasonable person would recognize the need."  Gibson, 290
11 F.3d at 1195.  Deliberate indifference under this theory does not
12 contain a subjective component.  Id. (citing Farmer, 511 U.S. at
13 841.

14     The Abdollahi plaintiffs present evidence that deputy Mantei
15 did not receive adequate training regarding the identification of
16 suicide risk factors nor regarding the management of inmates that
17 are going through heroin withdrawals.  (UMF No. 256; Mantei
18 Dep.at 51, 56).  These plaintiffs also present evidence that the
19 county maintained a policy that encouraged deficient referrals or
20 communications with JPS.  (UMF No. 47).  The county's omission in
21 training its employees to identify or handle suicide risks, to
22 manage inmates undergoing heroin withdrawals, and to communicate
23 suicide risks to JPS creates a genuine issue of material fact
24 with regard to the county's deliberate indifference.  Plaintiffs
25 are not required to demonstrate that defendant county knew these
26 policies are deliberately indifferent under the liability by
27 omission theory.  Gibson, 290 F.3d at 1195.  Because these
28 omissions are likely to result in the violation of Abdollahi's

22

constitutional right to receive adequate medical care while in
the custody of the county, a reasonable juror could conclude that
defendant county was deliberately indifferent to Abdollahi's
medical needs.

In order to satisfy <u>Gibson</u>'s third prong, plaintiffs present
evidence to demonstrate that the omissions in training in heroin
detoxification and suicide prevention was a moving force in the
violation of Abdollahi's rights.  Plaintiffs submit evidence that
the lack of sufficient training was a direct cause of Abdollahi's
death.  (Declaration of Richard Hayward ("Hayward Decl."), Pls.'
Exh. 16, ¶¶ 16-17; Kaufman Decl. ¶¶ 42-43).

Given the evidence that plaintiffs have presented in regards
to the county's suicide prevention policy as it applies to the
Abdollahi plaintiffs, these plaintiffs have raised a triable
issue of fact for their claim of liability by omission.
Defendants' motion for summary judgment for county liability
based upon the suicide prevention policy as it applies to the
Abdollahi plaintiffs is DENIED.

## 2. <u>The Suicide Prevention Policy in place at the time of the Arambula Death</u>

In Arambula's case, plaintiffs claims that the county
revised its suicide prevention policy but still failed to train
its employees to effectively communicate an individual's suicide
risk factors.  (Pls.' Opp. Summ. J. at 26).  Plaintiffs contend
that, in the absence of such a policy, Harnett failed to
effectively communicate suicide factors to the deputies that held
Arambula in their custody.  (SDF No. 36).

1    To satisfy the first prong of Gibson, plaintiffs present
2   evidence that defendant Harnett violated Arambula's
3   constitutional rights through deliberate indifference to his
4   safety.  For the reasons discussed below plaintiffs' claims
5   against Harnett, this prong has been satisfied.

6    To satisfy the second prong of Gibson, the Arambula
7   plaintiffs must present evidence that the county has customs or
8   policies that amount to deliberate indifference.  In the case of
9   Arambula, defendants present evidence that the county empaneled a
10  task force to review all relevant aspects of the jail operations
11  including training, screening, structural plant issues,
12  environmental issues, emergency procedures, inmate monitoring,
13  management interventions, inmate outreach, and administrative
14  review.  (UMF No. 52).  A total of 21 meetings of this task force
15  took place.  (Id. at No. 54).  In response, the county provided
16  more training to county employees regarding suicide risks,
17  typical signs, and manifestations.  (Id. at No. 73).  Plaintiffs
18  do not dispute that these measures were taken.

19   Plaintiffs present evidence that more detailed evaluations
20  as well as communication of varying risks of suicidality to
21  deputies on duty may have been a better policy for the county to
22  adopt.  (Hayward Decl. ¶ 24).  However, this evidence is
23  insufficient to substantiate an allegation of deliberate
24  indifference.  In light of the evidence that defendants have
25  presented as well as that of the plaintiffs, no reasonable juror
26  could find that the county was deliberately indifferent through
27  its suicide prevention policy as it applied to Arambula.
28  Therefore, defendants' motion for summary judgment for county

24

liability based upon the suicide prevention policy as it applies
to the Arambula plaintiffs is GRANTED.

**II.  Claims Against Blanas and Cooper**

    **A.   Federal Claims**

    All plaintiffs claim that defendants Blanas and Cooper are
liable under § 1983 both personally and in their official
capacities.  The Estates of Abdollahi and Summers claim
violations of Fourteenth Amendment substantive due process, and
the Estate of Arambula claims violations of the Eighth Amendment
protection against cruel and unusual punishment.  All individual
plaintiffs claim that Blanas and Cooper violated their
substantive due process rights by depriving them of parent child
relationships by allegedly causing the wrongful deaths of
Abdollahi, Summers, and Arambula.

              **1.   Personal Capacity Liability**

    Plaintiffs claim that Blanas and Cooper are liable in their
personal and individual capacities for constitutional violations.
In the case of a supervisor, "individual liability hinges upon
his participation in the deprivation of constitutional rights."
Larez v. City of Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).
This participation may involve the setting in motion of acts
which cause others to inflict constitutional injury.  Johnson v.
Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978).  For the court to
hold defendants liable in their individual capacities, plaintiffs
must demonstrate: (1) that defendants' "own culpable action or
inaction in the training, supervision, or control of his
subordinates" caused the constitutional injury; (2) that they
"acquiesce[d] in the constitutional deprivations of which [the]

1 complaint is made;" or (3) that their conduct showed a "reckless

2 or callous indifference to the rights of others."   See Larez, 946

3 F.2d at 646 (internal citations omitted).

4      Defendants argue that they are entitled to summary

5 adjudication of the individual capacity claims because neither

6 defendant personally participated in any of the decisions,

7 actions, or omissions which plaintiffs allege caused the wrongful

8 deaths, nor did either defendant actually supervise the

9 activities of any of those who allegedly caused the wrongful

10 deaths.  (Defs.' Mot. at 31).  Defendants argue that because of

11 the lack of participation or supervision of the conduct in

12 question, plaintiffs cannot establish the requisite causal

13 connection between the Constitutional deprivation and the conduct

14 of defendants Blanas and Cooper.  (Id. at 32).

15      Plaintiffs argue that Blanas and Cooper are individually

16 liable "because their actions or inactions condoned or ratified

17 the misconduct by their subordinates which led to the suicides."

18 (Pls.' Opp'n at 53).  Plaintiffs argue that personal liability is

19 based on Blanas and Cooper's failure to take any remedial steps

20 after the constitutional violations related to the jail suicides,

21 either through correction of policy, discipline, or adequate

22 investigation.  (Id.)

23      Plaintiffs rely heavily on Larez to substantiate their

24 arguments that Blanas and Cooper should be held liable in their

25 individual capacities.  The Larez court held that ratification by

26 inaction in response to a subordinate's conduct that violate's a

27 plaintiff's constitutional right may be sufficient to hold a

28 supervisor responsible for constitutional deprivations.  Id.

However, in <u>Larez</u>, the police chief had significantly more
involvement with the constitutional violations than either Blanas
and Cooper did.  In <u>Larez</u>, the plaintiffs' expert witness, "armed
with both many years practical police experience and empirical
data on police department procedures and operations nationwide
and in Los Angeles specifically," testified that he would have
disciplined the officers and would have established new
procedures so that the violations did not occur in the future.
<u>Id.</u>  The plaintiffs in that case also presented evidence that the
police chief signed a letter, informing the plaintiff that none
of his complaints would be sustained.  <u>Id.</u>

Plaintiffs in this case have not presented evidence of such
significant personal contact and ratification as in <u>Larez</u> to
establish a triable issue of individual liability for either
defendant Blanas or Cooper.  Rather, defendants have produced
evidence that in response to the suicides, Blanas, through his
leadership team that included Cooper, impaneled a Suicide
Prevention Task Force which sought to improve training, policies,
practices, and procedures relating to suicides.  (UMF Nos. 49-51;
Defs.' Reply P. & A., filed Nov. 4, 2005, at 2).  The task force
reviewed aspects of jail operations including training,
screening, and inmate monitoring.  (UMF No. 52).  This evidence
demonstrates that, unlike the chief in <u>Larez</u>, Blanas and Cooper
sought to address the policies which allegedly caused the
suicides.  Further, unlike the evidence of direct involvement of
the chief in <u>Larez</u>, Blanas did not act as a direct supervisor of
the allegedly offending officers.  Therefore, the basis for
plaintiffs' claims of individual liability of Blanas and Cooper

27

rest only on Cooper's ratification of his subordinate's conduct through a failure to discipline.  There is no authority for maintaining a claim for individual liability based *solely* on the failure to discipline subordinates.  <u>See</u> <u>Larez</u>, 946 F.2d at 646 (upholding jury verdict that a police chief was individually liable because he (1) failed to discipline the officers for constitutional violations; (2) failed to establish new procedures to avert reoccurrence; and (3) signed a letter informing plaintiff that none of the complaints would be sustained).  Because plaintiffs have not shown sufficient evidence that a triable issue of fact exists as to Blanas and Cooper's individual liability, defendants' motion for summary judgment is GRANTED.

## 2.   Official Capacity Liability

Plaintiffs further claim that defendants Blanas and Cooper are liable in their official capacities.  Official capacity suits "generally represent . . . another way of pleading an action against an entity of which an officer is an agent."  <u>Kentucky v. Graham</u>, 473 U.S. 159, 165-66 (1985) (citing <u>Monell v. New York City Dept. of Soc. Svcs.</u>, 436 U.S. 658, 690 n. 55 (1978).  To hold defendants liable in their official capacities, plaintiffs must show that a policy or custom or a one time decision by a governmentally authorized decision maker played a part in the violation of federal law.  <u>McRorie v. Shimoda</u>, 795 F.2d 780, 783 (9th Cir. 1986).

Blanas was the Sheriff of Sacramento County at all relevant times, and thus, the official responsible for policies, practices, and customs in the jail.  (UMF No. 1; SDF No. 11).  As discussed in the court's analysis of defendant county's municipal

28

liability, plaintiffs have presented evidence that jail policies
relating to suicide prevention, heroin detoxification, and cell
checks played a part in the alleged constitutional violations of
Abdollahi and Summers.  See Kentucky v. Graham, 473 U.S. 159, 166
(1985) ("[I]n an official-capacity suit, the entity's policy or
custom must have played a part in the violation of federal law.")
(internal quotation omitted).  Based upon this evidence, a
reasonable juror could conclude that Blanas developed,
implemented, or maintained policies that he knew or reasonably
should have known were deliberately indifferent to decedents''
personal security and were a moving force in the violations of
their constitutional rights.  See Redman v. County of San Diego,
942 F.2d 1435, 1448 (9th Cir. 1991).  Thus, defendants' motion
for summary judgment on the basis of defendant Blanas' official
liability as to the Abdollahi and Summers plaintiffs is DENIED.
However, because plaintiffs did not produce evidence that
deliberately indifferent county policies played a part in the
death of Arambula, defendants' motion for summary judgment as it
applies to the Arambula plaintiffs is GRANTED.

Cooper was the commander of the jail at the time of the
deaths of both Summers and Abdollahi, and thus, had authority
over operations orders, disciplinary matters, and investigations.
(UMF No. 2; Deposition of Captain James Cooper ("Cooper Dep."),
Pl.'s Exh. 39, at 10, 20).  Plaintiffs do not provide evidence
that Cooper had any control or policy-making authority in regards
to the suicide prevention policy or the heroin detoxification
policy, Consequently, there is no evidence upon which a
reasonable jury could conclude that Cooper was deliberately

1  indifferent to decedents'' rights in relation to these policies.

2  See Redman, 942 F.2d at 1449.  However, plaintiffs present

3  evidence that Cooper established a policy that ratified and

4  encouraged "pencil-whipping" and inadequate cell checks through

5  his failure to discipline officers who engaged in these

6  practices.  (SDF No. 17; Cooper Dep. at 27).  Plaintiff's expert

7  states that this policy or practice was a direct cause of

8  Summers' death.  Based upon this evidence, a reasonable juror

9  could conclude that Cooper implemented or maintained policies and

10  practices which he knew or should have reasonably known were

11  deliberately indifferent to Summers' personal security.

12  Therefore, defendants' motion for summary judgment on the basis

13  of Cooper's official liability as it relates to the Abdollahi and

14  Arambula plaintiffs is GRANTED.  Defendants' motion as it relates

15  to the Summers' plaintiffs is DENIED.

16      Defendants argue that they are entitled to qualified

17  immunity.  In an official capacity action, this defense is

18  unavailable.  Graham, 473 U.S. at 167.  Because the action

19  against the agency officials is, in essence, an action against

20  the agency, "the only immunities that can be claimed . . . are

21  forms of sovereign immunity that the entity, *qua* entity, may

22  possess."  Id.  Defendants are not entitled to qualified immunity

23  for liability in their official capacities.

24      **B.   State Law Claims**

25      The Estates of Abdollahi, Summers, and Arambula claim that

26

27

28

30

defendant Blanas is liable under state law for negligence per se.[9]
Defendants argue that because Blanas' liability is based upon
policy level activities which are within his discretion, he is
entitled to state law discretionary immunity pursuant to
California Government Code § 820.2.

Government Code § 820.2 provides immunity to a public
employee for injuries resulting form "his act or omission where
the act or omission was the result of the exercise of the
discretion vested in him, whether or not such discretion be
abused."  Cal. Gov't Code § 820.2 (West 2005).  Generally, "a
discretionary act is one which requires the exercise of judgment
or choice."  <u>Kemmerer v. County of Fresno</u>, 200 Cal. App. 3d 1426,
1437 (1988).  However, California courts have not set forth a
definitive rule which resolve every case.  <u>Id.</u>  Rather, the
California Supreme Court has adopted an analysis that relies on
the "policy considerations relevant to the purpose of granting
immunity to the governmental agency whose employees act in
discretionary capacities."  <u>Id.</u> (internal citations omitted).

> Immunity is reserved for those <u>basic policy decisions</u>
> which have been expressly committed to coordinate
> branches of government, and as to which judicial
> interference would thus be 'unseemly.' Such areas of
> quasi-legislative policy-making are sufficiently
> sensitive to call for judicial abstention from
> interference that might even in the first instance
> affect the coordinate body's decision-making process.

---

[9]    In their second amended complaint, plaintiffs alleged a
claim of negligence/negligence per se against Cooper.  However,
in their opposition to defendants' motion for summary judgment,
plaintiffs fail to point to any statutory duty giving rise to
liability by Cooper.  Plaintiffs also fail to discuss any factual
basis for liability for Cooper under their sixth claim for
relief.  Therefore, defendants' motion for summary judgment for
Cooper's liability under state law for negligence/negligence per
se is GRANTED.

1  Barner v. Leeds, 24 Cal. 4th 676, 685 (2000).

2       Plaintiffs argue that defendant Blanas' liability is not
3  based upon policy level discretionary decisions, but upon his
4  failure to perform mandatory duties imposed by California law.
5  Section 26605 of the California Government Code provides that
6  "the sheriff shall take charge of and be the sole and exclusive
7  authority to keep the county jail and the prisoners in it."  Cal.
8  Govt. Code § 26605 (West 2005).  Plaintiff argues that because
9  Blanas is the sole and exclusive authority of the Sacramento
10  County Jail, he had mandatory duties to implement regulations
11  relating to the maintenance of the jail.  Plaintiffs claim that
12  Blanas' alleged failure to fulfill these mandatory duties makes
13  him negligent per se.

14       Section 470A of the California Building Code sets forth the
15  design criteria for furnishings in local detention facilities.
16  24 CCR § 470A.  This section provides that inmates' beds "must .
17  . . have a solid bottom."  Id. § 470A.3.5.  The Guideline
18  following this requirement explains that "[b]eds with solid
19  bottoms are specified to limit the suicide risk associated with
20  perforated pans that can provide a location for an inmate to hang
21  themselves."  Id.  This regulation does not implicate any basic
22  policy decisions, but rather, imposes a mandatory duty to furnish
23  local detention facilities with solid bottom beds.  Therefore, §
24  820.2 immunity does not apply to any liability arising out of the
25  failure to furnish the inmates' cells with solid bottom beds.

26       Defendants point to the immunity provided in California
27  Government Code § 840, which immunizes employees for public
28  property conditions which cause injury.  Specifically, § 840

provides that "a public employee is not liable for injury caused
by a condition of public property where such condition exists
because of any act or omission of such employee within the scope
of his employment." Id.  However, pursuant to § 840.2, a public
employee can be held liable for injury caused by a dangerous
condition of public property.  "Dangerous condition" means a
condition of property that creates a substantial risk of injury
when such property is used with due care in a manner in which it
is reasonably foreseeable that it will be used.  Cal. Gov't Code
§ 830(a).  In these circumstances, the bunk holes were not a
"dangerous condition."  While it may be foreseeable that inmates
could use bunk holes as a location for tying the ligature to
hanging themselves, the use of the bunk hole in this manner
cannot possibly interpreted as use "with due care" as
contemplated by the statute.  See Chowdhury v. City of Los
Angeles, 38 Cal. App. 4th 1187, 1196 (1995).  Therefore, the bunk
holes are not a "dangerous condition" and defendant Blanas is
entitled to immunity.

     Plaintiffs also argue that Blanas had a mandatory duty to
provide adequate staffing in the jail.  Plaintiffs contend that
the resultant failure to perform safety checks caused Summers'
death and thus, supports a negligence claim by the Summers
plaintiffs.  Defendants point to the state immunity provided by
California Government Code § 845.2.  Section 845.2 provides that
"neither a public entity nor a public employee is liable for
failure to provide a prison, jail or penal or correctional
facility or, if such facility is provided, for failure to provide
sufficient equipment, personnel or facilities therein."  Id.

33

Because this section provided Blanas clear immunity for any failure to provide personnel, plaintiffs' negligence claim based upon these grounds fail.

Finally, plaintiffs argue that Blanas failed to provide for an adequate heroin detoxification program or an adequate suicide prevention program.  Regulations require that detention facilities have written medical policies on detoxification as well as written plans for a suicide prevention program. 15 CCR §§ 1213, 1219 (West 2005).  The regulations do not specify what components these policies must have.  Plaintiffs allege negligence based upon the adequacy of the jails policies.  These policy decisions regarding the choice of elements to include in jail detoxification programs and suicide prevention programs are the types of basic policy decisions that the legislature granted immunity for in § 820.2.  See Barner v. Leeds, 24 Cal. 4th at 685.

Plaintiffs further claim that defendants Blanas and Cooper are liable under state law for negligent supervision and training.  The evidence provided by plaintiffs focuses on defendants' failure to discipline their subordinates for allegedly inappropriate conduct.  The decision whether or not to initiate disciplinary proceedings and what discipline to impose is a discretionary decision.  See Kemmerer, 200 Cal. App. 3d at 1438.  "The decision involves the exercise of analysis and judgment as to what is just and proper under the circumstances and is not a purely ministerial act."  Id.; see also Caldwell, 10 Cal. 4th at 983 ("The . . . determination whether to . . . fire a person . . . must be considered a basic policy decision, immune

34

1  from civil damages actions."). Therefore, state law immunity

2  applies to Blanas' and Cooper's decisions whether to discipline

3  their employees.

4      Plaintiffs' claim for negligent training also fails for the

5  same reasons. Plaintiffs' claim focuses on Blanas' and Cooper's

6  training policies. Neither of these officials were responsible

7  for the day-to-day operations of the jail. Rather, they served

8  in supervisory roles. The negligent training claim is only

9  supported by evidence that the policies for training prison

10 personnel was deficient. Under state law, these are the types of

11 basic policy decisions that "involve the exercise of analysis and

12 judgment as to what is just and proper under the circumstances."

13 See Kemmerer, 200 Cal. App. 3d at 1438. Therefore, the decisions

14 relating to prison training policies are entitled to immunity

15 under § 820.2.

16     Because defendants Blanas and Cooper are entitled to

17 immunity from all of plaintiffs' state law claims, defendants'

18 motion for summary judgment is GRANTED.

19 **III. Claims Against Mantei**

20     **A.    Federal Claims**

21     The Abdollahi plaintiffs claim that defendant Mantei is

22 individually liable under federal law for his acts or omissions

23 of deliberate indifference which led to Abdollahi's death.

24 Specifically, the Estate of Abdollahi claims that Mantei violated

25 the deceased's substantive due process rights by his deliberate

26 indifference to serious medical needs, health, and safety that

27 allegedly resulted in Abdollahi's death by suicide. Sina

28 Abdollahi, individually, claims that Mantei violated his

substantive due process rights by depriving him of a parent child relationship by allegedly causing Abdollahi's wrongful death.

Defendants argue that no reasonable juror could conclude that Mantei was deliberately indifferent to the safety of Abdollahi.  Defendants present evidence that Mantei did not realize that Abdollahi had torn the sheet and wrapped it around his shoulders and neck in an effort to commit suicide, but rather interpreted the circumstances as an effort by Abdollahi to get warm.  (Decl. of Thomas Mantei ("Mantei Decl."), Defs.' Exh. 73, ¶ 11).  Defendants further argue that because Mantei opened the cell after noticing that the cell light was darkened and took the torn sheet from Abdollahi, (Id. ¶¶ 11-12), no reasonable juror could find that he acted with deliberate indifference.

Plaintiffs, however, present circumstantial evidence that Mantei knew that Abdollahi was a potential suicide risk.  Deputy Duke, the officer on shift with Mantei, informed him that Abdollahi was suicidal and had been seen by JPS.  (UMF No. 215). Mantei performed cell checks that night using a locator book to make sure that the names and pictures in the book matched the person in the cell.  (UMF 224; Mantei Dep. at 61-62).  Plaintiffs argue that this evidence shows that Mantei knew that the inmate he observed with the sheet around his neck was Abdollahi.

Plaintiffs also present evidence that Mantei was aware of the risk that Abdollahi would commit suicide based upon the observation of Abdollahi in his cell.  Abdollahi's cell light was covered by a blue piece of paper when Mantei performed his inspections.  (UMF No. 220).  Mantei knew that, inter alia, inmates covered their lights to cover conduct that is against the

36

1   rules.  (Mantei Decl. ¶ 18).  Mantei saw Abdollahi lying on top
2   of his blanket with his bed sheet torn into two pieces and
3   wrapped around his neck and shoulders.  (UMF No. 221).  Mantei
4   knew that, inter alia, sheets were torn by inmates for purposes
5   of making a ligature which could be used for a suicide attempt.
6   (Mantei Decl. ¶ 13).  Years earlier, Mantei had interrupted an
7   inmate from committing suicide by removing a blanket from around
8   the inmate's neck.  (Mantei Dep. at 64).  Mantei did not ask
9   Abdollahi about the torn sheet, and Abdollahi made no
10  explanation.  (UMF No. 221; Mantei Dep. at 86).

11       While defendants contend that Mantei did not have the
12  requisite knowledge of the risk to be held liable under a
13  deliberate indifference standard, plaintiff has offered several
14  pieces of circumstantial evidence that could lead a reasonable
15  factfinder to conclude that Mantei was aware of a substantial
16  risk to Abdollahi.  On a motion for summary judgment, the court
17  must examine all evidence in the light most favorable to the non-
18  moving party.  See Fed. R. Civ. Proc. 56.  Because defendants
19  have not shown that there are no material facts in dispute and
20  because plaintiffs have offered evidence that there are triable
21  issues of fact, defendants motion for summary judgment regarding
22  defendant Mantei's liability under federal law is DENIED.

23       **B.   State Law Claims**

24       The Estate of Abdollahi also alleges that defendant Mantei
25  is liable under state law (1) for failure to furnish or summon
26  medical care; and (2) for negligence.

27       California Government Code § 845.6 creates an affirmative
28  duty for public employees "to furnish or obtain medical care for

                                 37

a prisoner in his custody." "Under certain limited conditions, that is, actual or constructive knowledge of a need for immediate medical care, a duty of 'reasonable action to summon' medical care is created." Hart v. County of Orange, 254 Cal. App. 2d 302, 306 (1967). California courts have recognized that questions about jail personnel's actual or constructive knowledge of a prisoner's need for immediate medical care as well as the reasonableness of actions taken to meet this need are factual questions most appropriately decided by a jury. Zeilman v. County of Kern, 168 Cal. App. 3d 1174, 1184 (1985) (finding summary judgment was inappropriate for claims brought under § 845.6); Johnson v. County of Los Angeles, 143 Cal. App. 3d 298, 317 (1983); Hart, 254 Cal. App. 2d at 307.

Defendants argue that Mantei is immune from such claims as they arise out of Mantei's failure to determine that Abdollahi was suicidal. California Government Code § 855.8 provides immunity to public employees from § 845.6 liability for injuries "resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or addiction or from failing to prescribe for mental illness or addiction." This exception does not preclude all liability relating to mentally ill prisoners as a matter of law. Johnson, 143 Cal. App. 3d at 317. The scope of § 855.8 immunity is more limited than the scope of the general duty to summon medical care; it only immunizes an employee's failure to diagnose or to prescribe treatment. Id.

Plaintiffs present evidence that Mantei knew that Abdollahi was in need of immediate medical care. As discussed in the context of their federal claims, plaintiffs have produced

circumstantial evidence that Mantei knew that Abdollahi was a potential suicide risk and that the circumstances of Abdollahi's cell check, including a darkened cell light and a torn sheet around his neck and shoulders, put Mantei on notice that Abdollahi was suffering severe distress.  A reasonable juror could find that evidence of Abdollahi's suicidal condition would require Mantei to summon medical care.  The knowledge of defendant Mantei and the reasonableness of his action not to summon medical care are questions of fact to be determined at trial.  See id.  Thus, defendants' motion for summary judgment based upon Mantei's failure to summon medical care claim is DENIED.

The Estate of Abdollahi also brings a claim of state law negligence/negligence per se against defendant Mantei.  However, plaintiffs do not point to any statute imposing duty or liability apart from those discussed above.  Plaintiffs also do not address the separate claim of negligence in their opposition.  Because plaintiffs have failed to present any evidence to support a separate theory for a state law claim of negligence, defendants' motion for summary judgment based upon Mantei's negligence/negligence per se is GRANTED.

**IV.  Claims Against Johnson**

   **A.   Federal Claims**

The Abdollahi and Arambula plaintiffs claim that defendant Johnson is individually liable under § 1983 in her supervisory capacity.  The Estate of Abdollahi claims violations of Fourteenth Amendment substantive due process, and the Estate of Arambula claims violations of the Eighth Amendment protection

against cruel and unusual punishment.  The individual Abdollahi
and Arambula plaintiffs claim that Johnson violated their
substantive due process rights by depriving them of parent child
relationships by allegedly causing the wrongful deaths of
Abdollahi and Arambula through her deliberate indifference.

Defendants argue that Johnson is entitled to summary
judgment on this claims because the training provided to JPS
staff was adequate, JPS had a system of quick and effective
identification, assessment, and treatment of inmates with mental
health care needs, and the communication between JPS and the
county defendants was sufficient to survive a constitutional
challenge.  Johnson asserts that because JPS had adequate
policies and because JPS staff had adequate training, she cannot
be deemed deliberately indifferent for the purposes of § 1983
liability.

Plaintiffs contend that the liability of Johnson is based
not on her failure to train JPS staff, but rather on her failure
to adequately supervise or monitor her subordinates.
Specifically, plaintiffs argue that Johnson condoned or ratified
deliberate and reckless indifference to the medical needs of
Abdollahi and Arambula by condoning inadequate treatment by
defendants Ishibashi and Hartnett.  Plaintiffs also argue that
Johnson failed to establish new procedures for averting the
reoccurrence of such constitutional violations in the future.

As to the claims of the Abdollahi plaintiffs, plaintiffs
present evidence that Johnson failed to discipline or conduct an
adequate investigation into defendant Ishibashi's evaluation and
conduct of Abdollahi.  Plaintiffs, again, rely heavily on Larez

40

1  to argue that Johnson is personally liable on a ratification

2  theory.  However, as discussed in regards to defendants Blanas

3  and Coopers' individual liability, failure to discipline, without

4  more,[10] is insufficient to state a claim for personal liability

5  under § 1983.  Because plaintiffs fail to present evidence that

6  Johnson ratified or condoned deliberately indifferent conduct by

7  defendant Ishibashi, defendants' motion for summary judgment for

8  Johnson's § 1983 claim brought by the Abdollahi plaintiffs is

9  GRANTED.

10      As to the Arambula plaintiffs, plaintiffs present

11  significantly more evidence that Johnson ratified, condoned, and

12  encouraged deliberately indifferent behavior of defendant

13  Harnett.  Plaintiffs present evidence that Harnett was not a

14  licensed social worker, nor was license-eligible, and therefore,

15  she did not meet the minimum requirements of her job.  (SDF No.

16  40).  Plaintiffs present evidence that Harnett was seen by a co-

17  worker ripping up inmate requests for medical attention several

18  months before the Arambula death.  (Id. at No. 41).  The co-

19  worker reported this fact to Johnson who took no responsive

20  action.  (Id.)  Plaintiffs further present evidence that on March

21  3, 2003, Sgt. Nesemann wrote a memo to Johnson complaining of

22  Harnett's handling of a suicidal inmate.  (Id. at No. 42).

23  Despite knowledge of these alleged problems, in addition to

24  knowledge of the circumstances surrounding Harnett's conduct

25

26      [10]    Plaintiffs assert in their Statement of Disputed Facts
    that "Johnson affirmatively misrepresented the actions of
27  Ishibashi so as to minimize any wrongdoing on his part and
    impliedly by her."  (SDF No. 45).  However, plaintiffs' cited
28  evidence does not support this point.

1  relating to the Arambula suicide, Johnson gave Harnett an

2  outstanding annual evaluation.  (Id. at No. 43).

3      Defendants dispute these facts.  (RSDF Nos. 40-43).

4  However, these facts fall in line with the type of significant

5  contact and ratification that the Larez court held could

6  establish individual liability under § 1983.  See Larez, 946 F.2d

7  at 646.  Based upon the evidence presented, plaintiffs have

8  established a triable issue of fact that Johnson was deliberately

9  indifferent in her supervision of defendant Harnett.  Therefore,

10 defendants' motion for summary judgment for individual liability

11 of defendant Johnson under § 1983 as it applies to the Arambula

12 plaintiffs is DENIED.

13     Defendant Johnson further argues that she is entitled to

14 qualified immunity for any of the claims brought by plaintiffs

15 under § 1983.  The doctrine of qualified immunity protects from

16 suit government officers who do not knowingly violate the law.

17 Gasho v. United States, 39 F.3d 1420, 1438 (9th Cir. 1994).

18 Qualified immunity is a generous standard designed to protect

19 "all but the plainly incompetent or those who knowingly violate

20 the law."  Burns v. Reed, 500 U.S. 478, 495 (1991) (citation

21 omitted).  An officer can establish qualified immunity by

22 demonstrating (1) that the law governing her conduct was not

23 clearly established at the time of the challenged actions, or (2)

24 that under the clearly established law, she could reasonably have

25 believed that the alleged conduct was lawful.  See Katz v. United

26 States, 194 F.3d 962, 967 (9th Cir. 1999); Mendoza v. Block, 27

27 F.3d 1357, 1360 (9th Cir. 1994); see also Harlow v. Fitzgerald,

28 457 U.S. 800, 818 (1982) (observing that police officers "are

42

shielded from liability for civil damages insofar as their
conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have
known.")

The question of immunity generally is not one for the jury.
Qualified immunity "'is an immunity from suit rather than a mere
defense to liability' . . . . [Therefore,] [i]mmunity ordinarily
should be decided by the court long before trial." Hunter v.
Bryant, 502 U.S. 224, 228 (1991) (citation omitted).  However, if
a genuine issue of material fact exists regarding the
circumstances under which the officer acted, then the court
should make the determination after the facts have been developed
at trial.  Act Up!\Portland v. Bagley, 988 F.2d 868, 873 (9th
Cir. 1993).

The initial inquiry that the court must make to determine
whether an official is entitled to qualified immunity is whether,
"[t]aken in the light most favorable to the party asserting the
injury, do the facts alleged show the officer's conduct violated
a constitutional right?" Id. (citing Siegert v. Gilley, 500 U.S.
226, 232 (1991).  Based upon the court's analysis of Johnson's
supervisory liability above, the court has found that plaintiffs
have presented sufficient evidence for a reasonable juror to find
that a constitutional violation did occur.

If, as in this case, a violation could be made out on a
favorable view of the parties' submissions, the next inquiry is
whether the constitutional right was clearly established.  Id.
This inquiry must be taken in the light of the specific context
of the case.  The contours of the right must be sufficiently

43

clear that a reasonable official would understand that what she
is doing violates that right.  Id.  However, this does not mean
that an official action is protected by qualified immunity unless
the very action in question has previously been held unlawful,
but, rather, in light of pre-existing law, the unlawfulness must
be apparent.  Hope v. Pelzer, 536 U.S. 730, 739 (2002) (internal
citations omitted).  The salient question is whether the law at
the time of the disputed conduct gave defendants "fair warning
that their alleged treatment of plaintiffs was unconstitutional."
See id. at 741.

      The conduct in question surrounds the suicide of inmates
Arambula, which occurred in July 2003.  At this time, the law
regarding the fundamental right to be protected from the known
risks of suicide in jail and to have serious medical needs
attended to were clearly established.  Prison officials can be
held liable for deficient policies, either formal or established
by custom, where such policies were deliberately indifferent to
inmates' medical needs.  See Cabrales v. County of Los Angeles,
864 F.2d 1454, 1461 (9th Cir. 1988) opinion reinstated, Cabrales
v. County of Los Angeles, 886 F.2d 235 (9th Cir. 1989).  This
principle applies to the conduct of officials and medical
personnel surrounding prisoner suicides.  Id.  Further, at the
time of the conduct in question, the law was clear that a
municipal supervisor could be liable in his individual capacity
for ratifying and encouraging constitutional violations of his
subordinates where the supervisor failed to discipline officers
for violations, failed to reassess policies to avert
reoccurrences of violations, and ratified inadequate

44

1 investigations into the alleged violations.  See Larez v. City of

2 Los Angeles, 946 F.2d 630, 646 (9th Cir. 1991).

3       In light of the established state of the law at the time in

4 question, defendant Johnson had "fair warning that their alleged

5 treatment of plaintiffs was unconstitutional."  Hope, 536 U.S. at

6 741.  Because there are triable issues of fact as to whether

7 Johnson was deliberately indifferent to the conduct of Harnett,

8 and thus created a policy of condoning indifferent and reckless

9 behavior by Harnett, and because defendant had notice that her

10 alleged conduct was unconstitutional, the court cannot find that

11 Johnson is entitled to qualified immunity at this stage of the

12 litigation.

13       **B.   State Law Claims**

14       The Estates of Abdollahi and Arambula claim that Johnson is

15 liable under state law for negligence per se and negligent

16 supervision.  Defendants argue that because Johnson's liability

17 is based upon policy level activities which are within her

18 discretion, she is entitled to state law discretionary immunity

19 pursuant to California Government Code § 820.2.

20       In regards to the negligence per se claim, plaintiffs fail

21 to identify any statute establishing duty or liability.

22 Plaintiffs also fail to present any evidence to support this

23 claim.  Thus, defendants' motion for summary judgment as to the

24 negligence per se claims against Johnson is GRANTED.

25       In regards to plaintiffs' claims the negligent supervision,

26 the gravamen of the claims are that Johnson failed to discipline

27 or investigate Ishibashi or Harnett after receiving knowledge of

28 their allegedly inappropriate or inadequate conduct.  As analyzed

45

in the court's discussion of plaintiffs' state law claims against defendants Blanas and Cooper, the decision whether or not to initiate disciplinary proceedings and what discipline to impose is a discretionary decision. See Kemmerer, 200 Cal. App. 3d at 1438. Therefore, Johnson is entitled to discretionary immunity pursuant to § 820.2 for her decisions to discipline or not to discipline defendants Ishibashi and Harnett. Defendants' motion for summary judgment as to plaintiffs' claims of negligent supervision against Johnson is GRANTED.

**V.   Claims Against Ishibashi**

   **A.   Federal Claims**

      The Abdollahi plaintiffs bring a claim against defendant Ishibashi under § 1983 for violations of substantive due process. The Estate of Abdollahi claims that Ishibashi violated Abdollahi's substantive due process rights through his deliberate indifference to Abdollahi's medical needs that allegedly resulted in Abdollahi's death by suicide. Sina Abdollahi, individually, claims that Ishibashi violated his substantive due process rights by depriving him of a parent child relationship by allegedly causing Abdollahi's wrongful death.

      Defendants argue that no reasonable juror could conclude that Ishibashi was deliberately indifferent to the safety of Abdollahi. Defendants present evidence that Ishibashi subjectively believed that Abdollahi was not a suicide risk and that he executed a reasonable plan to meet Abdollahi's needs as he perceived them. Defendants contend that Ishibashi conducted a quick assessment of Abdollahi, from which he determined that Abdollahi's complaints were not based on suicidal intent or a

46

1  need to see a doctor, but rather to obtain medications for his

2  withdrawal symptoms. (Ishibashi RSUF No. 6). Ishibashi then

3  called the deputy on the floor to contact him if Abdollahi made

4  any future threats and to confirm that Abdollahi was scheduled to

5  receive the medications he desired. (Id. at No. 7). Defendants

6  argue that these facts show that Ishibashi was not deliberately

7  indifferent to a substantial risk to Abdollahi's safety because

8  he was not subjectively aware that Abdollahi was a suicide risk

9  and because he took reasonable measures after an assessment of

10  Abdollahi's condition.

11       Plaintiffs dispute the facts that defendants present in

12  their motion and present circumstantial evidence that Ishibashi

13  knew that Abdollahi was a potential suicide risk.  Plaintiffs do

14  not dispute that Ishibashi assessed Abdollahi in a short time.

15  Plaintiffs point out that the assessment took less than ten

16  minutes. (SDF No. 23; Ishibashi RSUF No. 12). However,

17  plaintiffs contend that Ishibashi knew that a proper suicide

18  assessment would have taken thirty to sixty minutes. (SDF No.

19  23). Ishibashi knew that Abdollahi had a history of heroin abuse

20  and observed that Abdollahi was experiencing medical symptoms

21  consistent with heroin withdrawal. (Id. at No. 24). Further,

22  Ishibashi was aware that an individual experiencing heroin

23  withdrawal poses a high suicidal risk unless properly monitored

24  and treated. (Ishibashi RSUF No. 6).

25       Plaintiffs also present circumstantial evidence that

26  Ishibashi was deliberately indifferent to the risk that Abdollahi

27  would commit suicide.  Ishibashi knew that Abdollahi had

28  threatened to kill himself if he did not see a doctor. (Id. at

47

No. 4).  However, he did not ascertain whether Abdollahi had been seen by a doctor, nor did he ever obtain such medical help.  (Id. at No. 7).  Ishibashi's response to his assessment of Abdollahi was to observe Abdollahi's pill count.  (Id. at No. 9).

Defendants argue that plaintiffs' claims amount to contentions that Ishibashi should have done more by way of diagnosis and treatment.  In Estelle v. Gamble, 429 U.S. 97, 108 (1976), the Supreme Court held that "a medical decision no to order an X-ray, or like measures, do not represent cruel and unusual punishment."  However, the facts presented by the plaintiffs in this case demonstrate circumstances that extend beyond "an inadvertent failure to provide adequate medical care" as was the case in Estelle.  Plaintiffs have presented circumstantial evidence that Ishibashi knew that Abdollahi was a suicide risk.  Plaintiffs have also presented evidence that Ishibashi was deliberately indifferent in his responses to such knowledge.  Thus, plaintiffs have presented facts that demonstrate to this court that there is a triable issue of fact as to whether defendant Ishibashi was deliberately indifferent to a substantial risk to Abdollahi's safety.  Summary judgement is therefore inappropriate, and defendants' motion is DENIED.

**B.   State Law Claims**

The Estate of Abdollahi also claims that defendant Ishibashi is liable under state law for failure to furnish or summon medical care.  As discussed in the court's analysis plaintiffs' state law claims against defendant Mantei's, California Government Code § 845.6 creates an affirmative duty for public employees "to furnish or obtain medical care for a prisoner in

48

his custody." Defendants argue that under § 855.8, Ishibashi is immune from such claims as they arise out of his failure to determine that Abdollahi was suicidal. As discussed in relation to defendant Mantei, the scope of § 855.8 immunity is more limited than the scope of the general duty to summon medical care; it only immunizes an employee's failure to diagnose or to prescribe treatment. <u>Johnson</u>, 143 Cal. App. 3d at 317.

Plaintiffs present evidence that Ishibashi knew that Abdollahi was in need of immediate medical care, regardless of any clinical assessment that he personally made. As discussed in the context of their federal claims, plaintiffs have produced circumstantial evidence that Ishibashi knew that Abdollahi was a potential suicide risk. Plaintiffs have also produced evidence that Ishibashi observed that Abdollahi was undergoing withdrawal from heroin and that Ishibashi knew that Abdollahi had complained of the need to see a doctor and of the inadequacy of his medication. A reasonable juror could find that evidence of Abdollahi's distressed condition as well as Abdollahi's threat that he would kill himself if he did not see a doctor would require Ishibashi to summon medical care. The knowledge of defendant Ishibashi and the reasonableness of his action not to summon medical care are questions of fact to be determined at trial. <u>See</u> <u>id.</u>

Defendants also argue that Ishibashi is immune under California Government Code § 856. Section 856 provides immunity to public employees for any injury resulting from the determination of whether to confine a person for mental illness or addiction. Like § 855.8, this immunity is limited and applies

only to injuries relating to the determination of whether a
person should be confined.  It does not cover the scope of a
public employee's duty to summon medical care.  Plaintiffs'
claims are not limited to injury resulting from a failure to
confine Abdollahi.  Plaintiffs claim that Ishibashi failed to
summon medical care when confronted with circumstances that put
him on notice of an immediate need to do so.  As discussed above,
plaintiffs have produced evidence such that a reasonable juror
could find that Ishibashi was required to summon medical care for
Abdollahi.  Because § 856 immunity does not extend to the limits
of the duty created by § 845.6, Ishibashi is not immune from
plaintiffs' claim.

The Estate of Abdollahi further claims that Ishibashi is
liable under state law for professional negligence.  Under
California law, a professional is "required to possess and
exercise . . . that reasonable degree of knowledge and skill
which is ordinarily possessed and exercised by other members of
his profession in similar circumstances."  Landeros v. Flood, 17
Cal. 3d 399, 408 (1976).  Generally, the determination of whether
conduct complied with the professional standard of care requires
expert testimony, unless the conduct in question is within the
common knowledge of layman.  See Flowers v. Torrance Memorial
Hosp. Med. Ctr., 8 Cal. 4th 992, 1001 (1994); Landeros, 17 Cal.
3d at 410.

Ishibashi argues that he is entitled to summary judgment
because, in the expert opinion of Charles Meyers, Ph.D., his
conduct in relation to Abdollahi met the applicable "standard of
care."  (Decl. of Charles Meyers, ¶¶ 3-4).  Ishibashi also argues

that plaintiffs have no expert opinion to the contrary.  However, plaintiffs do offer expert testimony that Ishibashi's conduct was inadequate.  In the expert opinion of Edward Kaufman, M.D., "the protocol followed for Abdollahi was inadequate."  (Kayfman Decl. ¶ 29).  He states that the inadequate evaluation by Ishibashi directly contributed to Abdollahi's death.  In the expert opinion of Richard Hayward, Ph.D., Ishibashi's treatment of Abdollahi "fell below the requisite standard of care."  (Hayward Decl. ¶ 26).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence.  See T.W. Elec. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630-31 (9th Cir. 1987).  Both defendants and plaintiffs have offered expert testimony regarding whether the conduct of Ishibashi violated the requisite standard of care.  Because the court cannot assess the credibility of the experts, and because the evidence is conflicting, there is a triable issue of fact as to whether Ishibashi was professionally negligent in his conduct toward Abdollahi.  Therefore, summary judgment is inappropriate, and defendants' motion is DENIED.

**VI.  Claims Against Harnett**

   **A.   Federal Claims**

The Arambula plaintiffs bring a claim against defendant Harnett under § 1983 for violations of substantive due process. The Estate of Arambula claims that Harnett violated Arambula's substantive due process rights through her deliberate indifference to Arambula's medical needs that allegedly resulted in Arambula's death by suicide.  Elias Arambula, Andrew Arambula,

Ausencio Arambula, and Socorro Arambula claim that Harnett violated their substantive due process rights by depriving them of a parent child relationship by allegedly causing Arambula's wrongful death.

Defendants argue that no reasonable juror could conclude that Harnett was deliberately indifferent to the safety of Arambula. Defendants present evidence that Harnett subjectively believed that Arambula was not a suicide risk. Plaintiffs, however, present circumstantial evidence that Harnett knew that Aramula was a potential suicide risk. Arambula's jail file documented a history of psychiatric problems, including the need for medication, auditory hallucinations, and prior suicide attempts. (SDF No. 35). The file also documented that Arambula refused to speak to JPS and refused to take his medication. (Id.) Harnett may have viewed Arambula's file before leaving her office to conduct the assessment, but admits that she reviewed at least a portion of Arambula's chart after her meeting. (Harnett RSUF Nos. 5, 10). Further, plaintiffs point to evidence that prior to Arambula's placement in a restraint chair and the subsequent assessment by Harnett, jail personnel observed Arambula talking to himself, banging his head into solid objects and physically resisting efforts by jailers to subdue him. (UMF Nos. 375-86). Harnett asked the custody officers what caused Arambula to be placed in the restraint chair. (Harnett RSUF No. 6). She has no present recollection as to what they told her, except that he had exhibited strange behavior. (Id.)

Based upon the above evidence, a reasonable juror could find that Harnett was deliberately indifferent to a substantial risk

1  to Arambula's mental health needs.  Therefore, summary judgment
2  is inappropriate, and defendants' motion is DENIED.

3        **B.   State Law Claims**

4      The Estate of Arambula also claims that defendant Harnett is
5  liable under state law for failure to furnish or summon medical
6  care.  As discussed in the court's analysis of plaintiffs' state
7  law claims against defendant Mantei, California Government Code §
8  845.6 creates an affirmative duty for public employees "to
9  furnish or obtain medical care for a prisoner in his custody."
10 Defendants argue that under § 855.8, Harnett is immune from such
11 claims as they arise out of her failure to determine that
12 Arambula was suicidal.  As discussed in relation to defendant
13 Mantei, the scope of § 855.8 immunity is more limited than the
14 scope of the general duty to summon medical care; it only
15 immunizes an employee's failure to diagnose or to prescribe
16 treatment.  Johnson, 143 Cal. App. 3d at 317.

17     Plaintiffs present evidence that Harnett knew that Arambula
18 was in need of immediate medical care, regardless of any clinical
19 assessment that she personally made.  As discussed in the context
20 of their federal claims, plaintiffs have produced circumstantial
21 evidence that Harnett knew that Arambula was a potential suicide
22 risk.  Plaintiffs have also produced evidence that Harnett knew
23 that Arambula was exhibiting strange behavior (such that he was
24 placed in a restraint chair), and that he had a history of
25 suicide attempts and need for medication for mental illnesses.  A
26 reasonable juror could find that evidence of Arambula's past
27 history of mental illness and treatment documented in his jail
28 file as well as the fact that Harnett was called to assess

53

1 Arambula after he was placed in a restraint chair would require

2 Harnett to summon medical care.  The knowledge of defendant

3 Harnett and the reasonableness of his action not to summon

4 medical care are questions of fact to be determined at trial.

5 See id.

6      Defendants also argue that Harnett is immune under

7 California Government Code § 856.  As discussed in the court's

8 analysis of plaintiffs' state law claims against defendant

9 Ishibashi, this immunity is limited and applies only to injuries

10 relating to the determination of whether a person should be

11 confined.  It does not cover the scope of a public employee's

12 duty to summon medical care.  Plaintiffs' claims are not limited

13 to injury resulting from a failure to confine Arambula.

14 Plaintiffs claim that Harnett failed to summon medical care when

15 confronted with circumstances that put her on notice of an

16 immediate need to do so.  As discussed above, plaintiffs have

17 produced evidence such that a reasonable juror could find that

18 Harnett was required to summon medical care for Arambula.

19 Because § 856 immunity does not extend to the limits of the duty

20 created by § 845.6, Harnett is not immune from plaintiffs' claim.

21      The Estate of Arambula further claims that Harnett is liable

22 under state law for professional negligence.  Under California

23 law, a professional is "required to possess and exercise . . .

24 that reasonable degree of knowledge and skill which is ordinarily

25 possessed and exercised by other members of his profession in

26 similar circumstances."  Landeros v. Flood, 17 Cal. 3d 399, 408

27 (1976).  Generally, the determination of whether conduct complied

28 with the professional standard of care requires expert testimony,

54

1   unless the conduct in question is within the common knowledge of
2   layman.  See <u>Flowers v. Torrance Memorial Hosp. Med. Ctr.</u>, 8 Cal.
3   4th 992, 1001 (1994); <u>Landeros</u>, 17 Cal. 3d at 410.

4        Harnett argues that she is entitled to summary judgment
5   because, in the expert opinion of Charles Meyers, Ph.D., her
6   conduct in relation to Arambula met the applicable "standard of
7   care."  (Meyers Decl. ¶ 7).  Harnett also argues that plaintiffs
8   have no expert opinion to the contrary.  However, plaintiffs do
9   offer expert testimony that Harnett's conduct was inadequate.  In
10  the expert opinion of Edward Kaufman, M.D., the lack of
11  evaluation by Harnett of Arambula's suicidal potential on the day
12  he died directly contributed to his death.  (Kaufman Decl. ¶ 51).
13  In the expert opinion of Richard Hayward, Ph.D., Harnett's
14  treatment of Arambula "fell below the requisite standard of
15  care."  (Hayward Decl. ¶ 28).

16       In judging evidence at the summary judgment stage, the court
17  does not make credibility determinations or weigh conflicting
18  evidence.  See <u>T.W. Elec. v. Pacific Elec. Contractors Ass'n</u>, 809
19  F.2d 626, 630-31 (9th Cir. 1987).  Both defendants and plaintiffs
20  have offered expert testimony regarding whether the conduct of
21  Harnett violated the requisite standard of care.  Because the
22  court cannot assess the credibility of the experts, and because
23  the evidence is conflicting, there is a triable issue of fact as
24  to whether Harnett was professionally negligent in his conduct
25  toward Arambula.  Therefore, summary judgment is inappropriate,
26  and defendants' motion is DENIED.

27                         **CONCLUSION**
28       Based on the foregoing analysis, the court makes the

                              55

following orders:

A.   As to the claims brought by the Abdollahi plaintiffs:

    1.   Defendant County of Sacramento's motion for summary judgment is:

        (a)   GRANTED as it applies to the cell check and staffing policies;

        (b)   DENIED as it applies to the heroin detoxification policy and the suicide prevention policy;

    2.   Defendant Blanas' motion for summary judgment is:

        (a)   GRANTED as it applies to § 1983 individual capacity liability;

        (b)   DENIED as it applies to § 1983 official capacity liability;

        (c)   GRANTED as it applies to plaintiffs' state law claims;

    3.   Defendant Cooper's motion for summary judgment is GRANTED as to all claims;

    4.   Defendant Mantei's motion for summary judgment is:

        (a)   DENIED as it applies to § 1983 liability;

        (b)   DENIED as it applies to plaintiffs' claims for failure to summon medical care;

        (c)   GRANTED as it applies to plaintiffs' claims for negligence/negligence per se;

    5.   Defendant Johnson's motion for summary judgment is GRANTED as to all claims;

    6.   Defendant Ishibashi's motion for summary judgment is:

        (a)   DENIED as it applies to § 1983 liability;

56

1          (b)   DENIED as it applies to plaintiffs' state law

2          claims;

3 B.   As to the claims brought by the Summers plaintiffs:

4    1.   Defendant County of Sacramento's motion for summary

5       judgment is:

6          (a)   DENIED as it applies to the cell check and

7             staffing policies;

8          (b)   GRANTED as it applies to the heroin detoxification

9             policy and the suicide prevention policy;

10    2.   Defendant Blanas' motion for summary judgment is:

11         (a)   GRANTED as it applies to § 1983 individual

12            capacity liability;

13         (b)   DENIED as it applies to § 1983 official capacity

14            liability;

15         (c)   GRANTED as it applies to plaintiffs' state law

16            claims;

17    3.   Defendant Cooper's motion for summary judgment is:

18         (a)   GRANTED as it applies to § 1983 individual

19            capacity liability;

20         (b)   DENIED as it applies to § 1983 official capacity

21             liability;

22         (c)   GRANTED as it applies to plaintiffs' state law

23            claims;

24 C.   As to the claims brought by the Arambula plaintiffs:

25    1.   Defendant County of Sacramento's motion for summary

26       judgment is GRANTED as to all claims;

27    2.   Defendant Blanas' motion for summary judgment is

28       GRANTED as to all claims;

1        3.    Defendant Cooper's motion for summary judgment is

2                GRANTED as to all claims;

3        4.    Defendant Johnson's motion for summary judgment is:

4                (a)   DENIED as it applies to § 1983 liability;

5                (b)   GRANTED as it applies to plaintiffs' state law

6                     claims;

7        5.    Defendant Harnett's motion for summary judgment is:

8                (a)   DENIED as it applies to § 1983 liability;

9                (b)   DENIED as it applies to plaintiffs' state law

10                    claims;

11       IT IS SO ORDERED.

12   Dated: December 15, 2005

13

14                                /s/ Frank C. Damrell Jr.
                             FRANK C. DAMRELL, JR.

15                                UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

26

27

28